# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-1657

TEJPAUL S. JOGI,

*Plaintiff-Appellant*,

v.

TIM VOGES, RON CARPER,
DAVID MADIGAN, and JOHN PILAND,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-CV-2067—**Harold A. Baker**, *Judge.*

———————

ARGUED SEPTEMBER 3, 2003—DECIDED SEPTEMBER 27, 2005

———————

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Since 1969, the United States has been a party to the Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261, a multilateral treaty. Among other things, the Vienna Convention requires its member states to ensure that a foreign national charged with a violation of host country law knows that he or she has the right to contact an official representative of his or her native country for assistance with legal proceedings. Tejpaul S. Jogi is an Indian citizen who was charged with aggravated battery with a firearm in Champaign County, Illinois. Jogi pleaded guilty to the crime and served six

years of a twelve-year sentence; at that point, he was removed from the United States and returned to India. No state official ever advised him of his right under the Vienna Convention to contact the Indian consulate for assistance, nor is there any hint that the Champaign County law enforcement officials ever contacted the Indian consulate on their own initiative on Jogi's behalf.

At some point after Jogi was in prison, he learned about the Vienna Convention. This prompted him to file several lawsuits, but the only one that is pertinent for our purposes is his present case, in which he filed a *pro se* complaint seeking compensatory, nominal, and punitive damages to remedy this violation. He named as defendants various Champaign County law enforcement officials, including the two investigators who questioned him after his arrest. Jogi's complaint relied on the Alien Tort Statute (ATS), 28 U.S.C. § 1350, which establishes jurisdiction in the district courts over a civil action by an alien for a tort committed in violation of a treaty of the United States. See generally *Sosa v. Alvarez-Machain,* 124 S.Ct. 2739 (2004). The district court found that the state officials had violated the Vienna Convention, but it concluded that Jogi's allegations were insufficient to trigger subject matter jurisdiction under the ATS.

To put it mildly, this case raises a bewildering array of complex issues. Although we find that the district court erred in granting the defendants' motion to dismiss on the ground it chose, we recognize the difficulty of the questions that lie just below its surface. With the benefit of the Supreme Court's *Sosa* decision, which was not available at the time the district court ruled, we conclude that the court had jurisdiction over the case. We further conclude that Jogi had an individual right to consular notification under the Vienna Convention. We therefore reverse and remand for further proceedings consistent with this opinion.

**I**

A citizen of India, Jogi emigrated to the United States in 1990, at the age of fourteen. On October 6, 1995, he was charged in Champaign County, Illinois, with aggravated battery with a firearm. Jogi turned himself in to the authorities on October 18, 1995. When Jogi surrendered, Ron Carper, a Champaign County investigator, took him to a conference room where Tim Voges, another investigator, and Jogi's mother were present. Carper advised Jogi of his *Miranda* rights, but he did not inform Jogi that he had the right under the Convention to contact the Indian consulate. Carper knew, however, that Jogi was Indian; his interview report listed Jogi as "Indian/Male"and Carper discussed with Jogi's mother the location of his father and sister in India and the possibility that Jogi might leave the country. (Another investigator not named as a defendant in this lawsuit also spoke with Jogi's mother about the location of Jogi's father in India and the status of Jogi's passport.) On July 9, 1996, Jogi pleaded guilty to aggravated battery with a firearm. As we noted earlier, he received a sentence of 12 years' imprisonment, but he was released after serving six years. At no time was Jogi ever informed of his right to contact the Indian consulate.

On May 15, 2000, Jogi filed suit in federal court, alleging a violation of the Vienna Convention; he cited the ATS, 28 U.S.C. § 1350, as a basis for the district court's jurisdiction. He named Voges, Carper, David Madigan (the Champaign County Sheriff) and John Piland (the Champaign County State's Attorney who prosecuted Jogi) as defendants. Jogi's *pro se* complaint sought damages "not only to compensate Plaintiff, for violation of his International Rights but also to deter the Champaign County Law Enforcement Agency or any other Law Enforcement Agency across the nation from committing the same violation." He attached an affidavit asserting that he

was unaware of his Vienna Convention rights and that he would have contacted the Indian consulate to avail himself of its assistance with the Champaign County prosecution had he been informed of his right to do so.

The district court held that it did not have subject matter jurisdiction over the complaint because Jogi had failed to sufficiently plead a tort under the ATS. *Jogi v. Piland*, 131 F. Supp. 2d 1024, 1027 (C.D. Ill. 2001). The court doubted that Jogi could show harm from the treaty violation, noting that Jogi had been advised of his *Miranda* rights and had been represented by counsel throughout his legal proceedings. *Id.* It concluded that the defendants' omissions may have "technically violated" the treaty, but that they did not trigger jurisdiction under the ATS because the statute applies only to "shockingly egregious violations of universally recognized principles of international law." *Id.* (citation and internal quotation marks omitted). After deciding that the alleged conduct in this case did not meet the "shockingly egregious" standard, the district court dismissed the complaint with prejudice. *Id.*

After Jogi filed a timely notice of appeal in this court, we appointed counsel and ordered additional briefing. Order, *Jogi v. Voges*, No. 01-1657 (7th Cir. Oct. 29, 2002). As a result of his criminal conviction, Jogi was removed to India on September 17, 2002. Because his action seeks only money damages, however, his removal did not render the case moot.

## II

We review *de novo* the district court's dismissal for lack of subject matter jurisdiction, accepting the complaint's factual allegations as true and drawing all reasonable inferences in Jogi's favor. *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). We bear in mind that Jogi's *pro se* complaint should be liberally construed. *Haines*

*v. Kerner*, 404 U.S. 519, 520 (1972); *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999). At this stage, it makes no difference whether Jogi pleaded the proper legal theories in his complaint. His only task, once he established a proper jurisdictional basis for his suit, was to satisfy the notice pleading standards of Rule 8. In that connection, we ask whether "the facts he has presented would entitle him to relief under any applicable legal theory." *McCullah v. Gadert*, 344 F.3d 655, 659 (7th Cir. 2003) (noting that "it is well established that plaintiffs are under no obligation to plead legal theories").

We begin this opinion, as we must, with the question of the district court's subject matter jurisdiction. We then turn to the question whether Jogi has stated a claim upon which relief can be granted, when he asserts that he has an individually enforceable right under the Vienna Convention that he is entitled to raise in a private civil action. Next, we ask whether Jogi's action is barred under the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), on the theory that recovery here would be inconsistent with the validity of his criminal conviction. Finally, we address several additional points that cannot be resolved at this stage of the litigation.

## A

The district court made it clear that it was "considering whether to dismiss [Jogi's] section 1350 claim for lack of subject matter jurisdiction." 131 F. Supp. 2d at 1026. In reviewing its decision to do just that, we take as our starting point the Supreme Court's decision in *Sosa.* There, the respondent Humberto Alvarez-Machain had brought a civil action against Mexican citizen José Francisco Sosa, who (along with several other Mexicans) had abducted Alvarez from his home in Mexico and transported him to the United States, at the behest and allegedly as the agent

of the U.S. Drug Enforcement Administration. Alvarez relied on the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), §§ 2671-2680, and the ATS as a basis for both jurisdiction and his right to recover. The Supreme Court rejected both theories, but we need discuss only the ATS portion of its opinion.

The ATS, which the *Sosa* Court reminded us was dubbed a "legal Lohengrin" by Judge Friendly, see *IIT v. Venecap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975), quoted at 124 S.Ct. at 2754-55, is a model of brevity, if not clarity. On the books since the First Judiciary Act of 1789 and essentially unchanged since then, it now reads as follows: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The first question the Court had to decide was whether the statute was jurisdictional only, or if it also authorized the creation of a new cause of action for torts in violation of international law. It concluded that "the statute was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." 124 S.Ct. at 2755. That, however, was the easy part. After concluding that the ATS was a jurisdictional statute, the Court then considered how it interacted with the international law of the late eighteenth century. It concluded that Congress would not have enacted a "still-born" law, and thus that there must have been some "torts in violation of the law of nations" that "would have been recognized within the common law of the time." *Id.*

Although the Court acknowledged that most of the law of nations at the time the ATS was enacted dealt with the norms governing the behavior of nation-states with one another, it recognized that this body of law included "a second, more pedestrian element . . . that did fall within the judicial sphere, as a body of judge-made law regulating the

conduct of individuals situated outside domestic boundaries and consequently carrying an international savor." *Id.* at 2756. There was also "a sphere in which these rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships." *Id.* Examples of the last type included violations of safe conducts, infringements of the rights of ambassadors, and piracy. The Court concluded that the ATS was enacted with the last set of concerns in mind. Although it did not intend the ATS to be "a jurisdictional convenience to be placed on the shelf" for later use, *id.* at 2758, it did expect that the statute would "furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." *Id.* at 2759.

The remainder of the Court's discussion in *Sosa* is of only marginal relevance to Jogi's case, because it is concerned with claims based on customary international law, or, in the statute's words, "the law of nations." It is in that sense that we must understand the Court's comment that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 2761-62. It analyzed Alvarez's claim as one that did not arise under any treaty. *Id.* at 2766. Although the Court recognized that Alvarez relied on the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948), and on the International Covenant on Civil and Political Rights art. 9, Dec. 19, 1996, 999 U.N.T.S. 171, as evidence of the international norms he was trying to vindicate, the Court made it clear that neither instrument was the kind of "treaty" to which the ATS refers. The Universal Declaration is nothing more than that—a declaration adopted by the U.N. General Assembly with no positive force of law. The Covenant, while a treaty to which the United States has adhered, was expressly declared to be non-self-executing at the time of ratifica-

tion and thus did not create any obligations enforceable in the federal courts. 124 S.Ct. at 2767. In the end, therefore, the Court rejected Alvarez's claim as one that failed not for lack of jurisdiction, but because it did not pass the substantive threshold the Court had defined for cases based on customary international law norms.

Seen in this light, Jogi's case is straightforward from the point of view of subject matter jurisdiction. His complaint alleges that he is the victim of a tort committed in violation of a treaty of the United States—the Vienna Convention. He does not assert that his claim arises under customary international law, and so the knotty question of the degree to which customary international law is in fact federal law, or federal common law as opposed to state common law, need not detain us. The ATS confers jurisdiction on the federal district courts to adjudicate this type of case. Indeed, so does 28 U.S.C. § 1331, which today says that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." In 1789, of course, there was no equivalent to today's § 1331, which was not added to the Judicial Code until 1875. See Act of March 3, 1875, § 1, 18 Stat. 470. Moreover, from 1875 until 1976, there was an amount in controversy requirement attached to the general federal question jurisdictional statute. See generally 13B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3561.1 (2d ed. 1984). Thus, from 1789 until 1976, aliens wishing to sue in federal courts for torts in violation of treaties would have had to use § 1350 as a jurisdictional basis unless their claim met the amount in controversy requirement. Today, we cannot imagine a case that an alien could bring under the "treaty" branch of § 1350 that would not also fall within the "treaty" jurisdiction of § 1331. The "law of nations" branch of § 1350 may continue to serve the purpose of making the federal court's jurisdiction over this class of claims clear, however broad or narrow it may prove to be after *Sosa.*

**B**

This takes us to the crux of the case, whether we are relying on § 1331 jurisdiction or § 1350 jurisdiction: has Jogi stated a claim under the Vienna Convention on which relief can be granted? Here, too, there are a number of distinct points we must discuss. First, what exactly does the Vienna Convention have to say about consular notification and for what purpose was this provision included? Second, is the Vienna Convention a self-executing treaty, or is it (like the Covenant on Civil and Political Rights *supra*) something that is non-self-executing and thus automatically unavailable to Jogi? Third, even if the Convention is self-executing, does it create an individual right that can be enforced in court, or does it address only rights between states party to the Convention? Finally, assuming that there are individually enforceable rights, what kind of remedial structure does the Convention contemplate? We take these questions in the order we have listed them here.

1.  *The Vienna Convention and Article 36*

The Vienna Convention is a 79-article, multilateral treaty to which both the United States and India are signatories. The treaty covers topics such as consular relations in general; consular functions; facilities, privileges, and immunities of consular personnel; and communications with nationals of the sending state. The Preamble recalls that "consular relations have been established between peoples since ancient times," notes the principle of sovereign equality among states, recognizes the usefulness of a convention on this subject, and, importantly for our case, "realiz[es] that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention, pmbl.

Notwithstanding the latter paragraph of the Preamble, the Vienna Convention singles out individual rights in at least two places. The first is in the list of consular functions found in Article 5, which includes "helping and assisting nationals, both individuals and bodies corporate, of the sending State," Art. 5(e), and "representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests," Art. 5(i).

The second, which is the critical one for Jogi, is Article 36, which reads as follows:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) *if he so requests*, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph*;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the *said laws and regulations must enable full effect* to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention, Art. 36 (emphasis added). Among other requirements, this provision instructs authorities of a receiving state to notify an arrested foreign national of "his rights" under the Convention "without delay." *Id.* at ¶1(b).

There is an obvious tension between the broad language of the clause in the Preamble that appears to disclaim any general intent to protect individuals, and the language of Article 36. We address it in more detail below, when we consider whether Jogi has an individual right of action, but it is helpful here to set the stage for that discussion. One commentator has observed that of the Vienna Convention's 79 articles, the one with the "most tortuous and checkered background is indubitably Article 36." LUKE LEE, VIENNA CONVENTION ON CONSULAR RELATIONS 107 (1966). The delegates to the Vienna Convention discussed and debated Article 36 extensively before it was finally approved. *Id.* at 107-14; 1 United Nations Conference on Consular Relations: Official Records, at 3, U.N. Doc. A/Conf. 2 5/6, U.N. Sales. No. 63.X.2 (1963).

The debates that took place as the Convention was being drafted reflect close attention to the question of the individual's right to consular notification. The district court's decision in *Standt v. City of New York,* 153 F. Supp. 2d 417 (S.D.N.Y. 2001), provides a useful summary of these discussions:

> [There was] widespread concern with the question of individual rights. For example, a proposed amendment by Venezuela that would have eliminated the individual right of consular communication was withdrawn after receiving strong opposition from other member states. 2 United Nations Conference on Consular Relations: Official Records, at 37, 38, 84, 85, 331-34, U.N. Doc. A/Conf. 2 5/6, U.N. Sales. No. 63.X.2 (1963). . . . The United States, in particular, proposed language intended to "protect the rights of the national concerned." *Id.* at 337. In short, "the 'legislative history' of the Treaty supports the interpretation that Article 36 was intended to confer individual rights on foreign nationals." [Mark J.] Kadish, [*Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Counsel,*] 18 MICH. J. INT'L L. [565], at 599 [1997].

*Standt*, 153 F. Supp. 2d at 425-26.

The First Circuit had occasion to visit this issue in the case of *United States v. Li*, 206 F.3d 56 (1st Cir. 2000) (en banc), a case to which we return below. In an opinion concurring in part and dissenting in part, then-Chief Judge Torruella provided this helpful background; rather than reinvent the wheel, we quote from his opinion:

> The positions of the delegates from the United Kingdom and Australia were typical of the prevailing view. The former expressed his rejection of a proposal that a consul be notified only if the detained national so requested, because "[i]t could well make the provisions

> of Article 36 ineffective because the person arrested might not be aware of *his rights.*" [LEE, VIENNA CONVENTION ON CONSULAR RELATIONS] at 83-84 (emphasis supplied); *see also id.* at 339, 344. The Australian delegate stated along a similar vein, that "[t]here was no need to stress the extreme importance of not disregarding, in the present or any other international document, the *rights of the individual.*" *Id.* at 331 (emphasis supplied). In fact the United States delegate proposed an amendment to Article 36(1)(b) that the notification to a consul of a national's detention be made at the request of the national, "to protect the *rights of the national concerned.*" *Id.* at 337 (emphasis supplied). From these and other statements by the various national delegates there should be little doubt that the treaty under consideration concerned not only consular rights but also the separate individual rights of detained nationals. . . . [At this point the opinion gives specific references to the statements of delegates from 15 different countries.] [S]*ee also* Mark Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search For the Right to Counsel,* 18 Mich. J. Int'l L. 565 (1997) (discussing the Vienna Convention's history in this respect); *Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963* (hereinafter "U.S. Vienna Report").

206 F.3d at 73-74. As then-Chief Judge Torruella went on to point out, the ultimate amendment that became Article 36 was adopted by a margin of 65 votes to 2, with 12 abstentions. The United States delegate voted in favor of the amendment. *Id.* at 74.

Secretary of State William P. Rodgers indicated that Article 36 provided an individual right in his Letter of Transmittal, through which he officially submitted the certified copy of the Convention to the President. There he

wrote that Article 36 "requires that authorities of the receiving State inform the person detained of *his right* to have the fact of his detention reported to the consular post concerned and of *his right* to communicate with that consular post." *Id.* (emphasis added). The U.S. Vienna Report explained that "[t]his provision has the virtue of setting out a requirement which is *not beyond means of practical implementation in the United States*, and, at the same, is useful to the consular service of the United States in the protection of our citizens abroad." *Id.* (emphasis added).

This is enough to give a sense of what Article 36 is about, and the two positions on its scope. Jogi argues that it confers an individual right on a person from the "sending" state to consular notification, while the defendants urge that it does no such thing, and that the notification process is for the convenience of the consular services and their respective governments. We return to this question below, when we consider whether such an individual right exists. Before doing so, however, it is necessary to decide whether the Convention is self-executing; if it is not, then Jogi's suit must fail for that reason alone. See *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) (per curiam) (holding that if not implemented by enabling legislation, a treaty can provide a basis for a private lawsuit only if it is self-executing).

### 2. *Self-Executing Nature of the Convention*

The RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW lists three different ways in which a treaty might be non-self-executing:

> (a) if the agreement manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation,

(b) if the Senate in giving consent to a treaty, or Congress by resolution, requires implementing legislation, or

(c) if implementing legislation is constitutionally required.

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(4) (1987) (cited below as "RESTATEMENT THIRD"). The commentary adds that "the intention of the United States determines whether an agreement is to be self-executing in the United States or should await implementation by legislation or appropriate executive or administrative action." *Id.* cmt. h. Thus, an agreement is self-executing if it can be given effect without further legislation or analogous domestic measures. Finally, the Comment cautions that "[w]hether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies." *Id.*

Another commentator has suggested that there are four grounds on which a court might conclude that a treaty is not self-executing, despite the fact that treaties have the status of "supreme Law of the Land" under the Supremacy Clause of the Constitution, Art. VI, cl. 2. See Carlos Manuel Vazquez, *The Four Doctrines of Self-Executing Theories*, 89 AM. J. INT'L L. 695 (1995). Professor Vazquez's list is as follows:

First, legislative action is necessary if the parties to the treaty (or perhaps the U.S. treaty makers alone) intended that the treaty's object be accomplished through intervening acts of legislation. Second, legislative action is necessary if the norm the treaty establishes is "addressed" as a constitutional matter to the legislature. Third, legislative action is necessary if the treaty purports to accomplish what under our Constitution may be addressed only by statute. Finally, legislation is necessary if no law confers a right of action on a plaintiff seeking to enforce the treaty.

*Id.* at 696-97. The last of these categories, however, is not what it appears to be on the surface. Later in the article, Professor Vazquez both criticizes it in principle as being too likely to confuse and says that "[i]t is a mistake, however, to assume that a treaty may be enforced in court by private parties only if it confers a private right of action itself." *Id.* at 719. It is in that context that he goes on to argue that "[t]he 'private right of action' to enforce a treaty *may* have its source in laws other than the treaty itself." *Id.* at 720 (emphasis added).

In our view, the better practice is to keep separate the question of self-executing character and the question of a private right of action, in keeping with the position in the commentary to the RESTATEMENT THIRD. In principle, the latter question is one that we should analyze in the same way we would approach legislation from Congress where the question was whether a private right of action exists under the law. We therefore confine our attention here to the question whether legislative action was necessary before the Vienna Convention could be enforced.

Some of the factors we have identified in the past as helpful in discerning the intent of the parties to the agreement include (1) the language and purposes of the agreement as a whole; (2) the circumstances surrounding its execution; and (3) the nature of the particular obligation imposed by the part of the agreement under consideration (bearing in mind that treaties may be partly self-executing and partly not). *Frolova, supra*, 761 F.2d at 373. As we noted there, if the parties' intent is clear from the treaty's language, courts will not inquire into the remaining factors. *Id.*

Other circuits use similar tests to determine whether a treaty is self-executing. See *People of Saipan v. U.S. Dept. of Interior*, 502 F.2d 90, 97 (9th Cir. 1974) (finding that whether an international agreement "establishes affirma-

tive and judicially enforceable obligations without implementing legislation" depends on "the purposes of the treaty and the objectives of its creators, the existence of domestic procedures and institutions appropriate for direct implementation, the availability and feasibility of alternative enforcement methods, and the immediate and long-range social consequences of self- or non-self-execution"); *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976) ("In determining whether a treaty is self-executing courts look to the intent of the signatory parties as manifested by the language of the instrument, and, if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution."). In our view, the duties imposed by Article 36 meet these criteria.

Before drawing a final conclusion, however, we must take into account the views of the State Department. During the Senate hearings prior to ratification, a State Department official testified that it was "entirely self-executive [sic] and does not require any implementing or complementing legislation." S. Exec. Rep. No. 91-9 app. at 5 (1969) (statement of Deputy Legal Adviser J. Edward Lyerly) (cited in Note, *Too Sovereign But Not Sovereign Enough: Are U.S. States Beyond the Reach of the Law of Nations?*, 116 HARV. L. REV. 2654, 2657 (2003)). In a recent brief to the Supreme Court, the United States government acknowledged "the accepted understanding that the Vienna Convention is self-executing," citing this same legislative history. Brief for United States as *Amicus Curiae* at 26, *Medellin v. Dretke*, 125 S.Ct. 2088 (2005) (No. 04-5928). Courts have also noted that the treaty was self-executing when ratified. See, *e.g.*, *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner, J., concurring) ("The Vienna Convention is a self executing treaty . . . ." (citing *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996))); *United States v. Torres-Del Muro*, 58 F. Supp. 2d 931, 932 (C.D. Ill. 1999) ("[T]he Court notes, and the parties agree, that the [Vienna Convention] is 'self-

executing' . . . ."); see also David J. Bederman, *Deference or Deception: Treaty Rights as Political Questions*, 70 U. COLO. L. REV. 1439, 1482 (1999) (noting that in litigation related to a Vienna Convention violation, the U.S. government did not dispute that the Convention was self-executing).

Statements of this type are entitled to great weight in our assessment of this question. See generally RESTATEMENT THIRD § 111 cmt. h. Although there is also evidence to suggest that the State Department believed that the only *remedies* for a violation of the Vienna Convention are diplomatic or political, that point is better addressed when we consider the question of an individual action. It is quite possible for a treaty to take effect without the need for further legislation, and nonetheless for that treaty to confer rights only at the state-to-state level. We therefore conclude that the Vienna Convention is a self-executing treaty, and move on to the issue that has generated the greatest degree of controversy in recent years: whether Article 36 confers individually enforceable rights.

### 3. *Individual Right of Action*

When the United States Senate gave its advice and consent to the ratification of the Vienna Convention in 1969, 115 Cong. 30997 (by a vote of 81 to 0), it became the "supreme Law of the Land," binding on the states. U.S. Const. art. VI, cl. 2; *Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation."); *Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam) (stating that treaties are "on a full parity" with acts of Congress) (citing *Reid v. Covert,* 354 U.S. 1, 18 (1957) (plurality opinion)).

The Supreme Court has recognized that treaties, which are basically agreements among sovereign nations, may provide for individual rights. *United States v. Raucher*, 119

U.S. 407 (1886) (holding that the provisions of an extradition treaty, permitting prosecution only for the crime on which extradition was based, could serve as a defense to the attempted prosecution of another crime); *United States v. Alvarez-Machain*, 504 U.S. 655, 664-70 (1992) (*Alvarez-Machain I*) (considering whether Alvarez's abduction violated the terms of an extradition treaty between the United States and Mexico); *Head Money Cases*, 112 U.S. 580, 598 (1884) (stating that "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations" that "partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country").

In the case of the Vienna Convention, the Supreme Court has said, without finally deciding the point, that Article 36 "arguably confers on an individual the right to consular assistance following arrest." *Breard*, 523 U.S. at 376. In *Breard*, the Court faced facts that have become commonplace in Vienna Convention cases: a criminal defendant who was trying to use federal habeas corpus or other criminal proceedings to seek a remedy for a Convention violation based in the criminal law. *Id.* at 377 (finding that Breard had procedurally defaulted his Vienna Convention claim on habeas review by failing to raise it in state court). On analogous facts, this court and most of our sister circuits have refrained from deciding whether an individual right exists under the Vienna Convention; instead, most have concluded that the various remedies available to criminal defendants, such as the quashing of an indictment or the exclusionary rule, are not appropriate cures for a violation. *United States v. Li, supra*, 206 F.3d at 60 (1st Cir. en banc) ("We hold that irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment."); *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) ("Even if we assume *arguendo* that De La Pava had judicially enforceable rights

under the Vienna Convention—a position we do not adopt—the Government's failure to comply with the consular notification provision is not grounds for dismissal of the indictment."); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (finding that "even if the Vienna Convention on Consular Relations could be said to create individual rights" the defendant could not obtain habeas relief because his claim was procedurally defaulted); *United States v. Page*, 232 F.3d 536, 541 (6th Cir. 2000) (concluding that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36"); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 621 (7th Cir. 2000) ("It is sufficient for present purposes to assume that such an individual right is created by the Convention and to confront squarely whether the exclusionary rule is the appropriate sanction for a violation of that right."); *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000) (same); *United States v. Ortiz*, 315 F.3d 873, 886 (8th Cir. 2002) ("Even if we assume for present purposes that the Convention creates an individually enforceable right, it would not follow, on this record, that the statements should be excluded merely because the Convention has been violated."); *United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000) (en banc) (declining to decide whether Article 36 creates an individually enforceable right but concluding that suppression of evidence is an inappropriate remedy); *United States v. Minjares-Alvarez*, 264 F.3d 980, 986-87 (10th Cir. 2001) (declining to decide whether the Vienna Convention creates individually enforceable rights, but concluding that suppression is not an appropriate remedy); *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) (holding that a violation of the Vienna Convention does not warrant dismissal of an indictment); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000) (per curiam) (same). Two circuits have found, in the context of

a criminal proceeding, that the treaty does not confer individual rights. *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001).

This court is the first one to be directly confronted with the question whether a private civil action independent of the criminal proceeding may be based on the Convention. *Lombera-Camorlinga*, 206 F.3d at 888 (noting that the court did "not decide whether a violation of Article 36 may be redressable by more common judicial remedies such as damages . . . ."). The distinction between enforcement or remedial measures that affect criminal prosecutions and civil actions is an important one, as the literature exploring the possibility of deterring unlawful police behavior through damages actions under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), illustrates. See, *e.g.*, Harold J. Krent, *How To Move Beyond the Exclusionary Rule: Structuring Judicial Response To Legislative Reform Efforts*, 26 PEPP. L. REV. 855 (1999); L. Timothy Perrin, H. Mitchell Caldwell, Carol A. Chase & Ronald W. Fagan, *If It's Broken, Fix It: Moving Beyond the Exclusionary Rule*, 83 IOWA L. REV. 669 (1998); Walter E. Dellinger, *Of Rights and Remedies: The Constitution As A Sword*, 85 HARV. L. REV. 1532 (1972). Our consideration here of the question whether there is a private action for Jogi is therefore in no way inconsistent with our conclusion in *Chaparro-Alcantara*, *supra,* that the exclusionary rule is not available for violations of the Vienna Convention.

Our inquiry begins, naturally, with the text of Article 36. "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *Alvarez-Machain I*, 504 U.S. at 663; *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) ("Interpretation of [the Treaty] must, of course, begin with the language of the Treaty itself [, and] [t]he clear import of Treaty language

controls . . . ."); see also Vienna Convention on the Law of Treaties (Treaty Convention), May 23, 1969, art. 26, 1155 U.N.T.S. 331, 339 (governing the interpretation of treaties and directing courts to look first to the plain language of a treaty when attempting to determine its meaning). Article 36 ¶1(b) states, plainly enough, that authorities "*shall* inform the person concerned without delay *of his rights* under this sub-paragraph." (emphasis added). Justice O'Connor, noting this language, has observed that, "if a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,' I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed." *Medellin v. Dretke*, 125 S.Ct. 2088, 2104 (2005) (O'Connor, J., dissenting from dismissal of writ of *certiorari* as improvidently granted). A number of judges have noted that "the text emphasizes that the right of consular notice and assistance is the citizen's" and that this language is "mandatory and unequivocal." *Breard v. Pruett*, 134 F.3d at 622 (Butzner, J., concurring); *Li*, 206 F.3d at 72 (Torruella, C.J., concurring in part, dissenting in part) ("I have some difficulty envisioning how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national, and that the failure to promptly notify him/her of these rights constitutes a violation of these entitlements by the detaining authority."); *United States v. Hongla-Yamche*, 55 F. Supp. 2d 74, 77 (D. Mass. 1999) ("The language of Article 36 clearly refers to the existence of an individual right.").

Faced with this unambiguous text, the defendants rely heavily on the treaty's preamble, which we reproduced above. The critical language is found in the fifth paragraph, which says: "Realizing that *the purpose of such privileges and immunities is not to benefit individuals* but to ensure the efficient performance of the functions by consular posts

on behalf of their respective States . . . ." Vienna Convention, pmbl. (emphasis added). That statement is a perfectly good reflection of almost every other article of the Convention. It is at best, however, ambiguous with respect to Article 36. First, it is not clear whether it has any application at all to Article 36. We are inclined to agree with Jogi that the most reasonable understanding of this language is as a way of emphasizing that the Convention is not designed to benefit diplomats in their individual capacity, but rather to protect them in their official capacity. See *United States v. Rodrígues*, 68 F. Supp. 2d 178, 182 (E.D.N.Y. 1999) ("[I]t appears that the purpose of [the Preamble] is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to provide special treatment for individual consular officials."); Kadish, *supra,* 18 MICH. J. INT'L L. at 594 ("The privileges and immunities granted in the Vienna Convention are to enable the consul to perform his enumerated functions, not to benefit the consul personally. Thus, the preamble language refers to the individual consul, not individual foreign nationals.").

It is a mistake in any event to allow general language of a preamble to create an ambiguity in specific statutory or treaty text where none exists. Courts should look to materials like preambles and titles only if the text of the instrument is ambiguous. See, *e.g.*, *Whitman v. American Trucking Assns,* 531 U.S. 457, 483 (2001) (inappropriate to look at title of section to create ambiguity if text is clear; the clear text "eliminates the interpretive role of the title, which may only shed light on some ambiguous word or phrase in the statute itself"); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 290-91 (2000) (rejecting language of preamble of local ordinance as definitive for First Amendment challenge); *Fidelity Federal Sav. & Loan Assn v. de la Cuesta*, 458 U.S. 141, 158 n.13 (1982) (look to the preamble only for

the administrative construction of the regulation, to which deference is due). See generally 2A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 47.04, at 146 (5th ed. 1992, Norman Singer ed.) ("The preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.").

In *United States v. Stuart*, 489 U.S. 353 (1989), the Supreme Court stated "a treaty should generally be construed . . . liberally to give effect to the purpose which animates it and that [e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred*." Id.* at 368 (citation and internal quotation marks omitted); *Asakura v. City of Seattle*, 265 U.S. 332, 342 (1924) ("Treaties are to be construed in a broad and liberal spirit, and, when two constructions are possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred.").

Particularly in this light, we conclude that even though many if not most parts of the Vienna Convention address only state-to-state matters, Article 36 confers individual rights on detained nationals. Although international treaties as a rule do not create individual rights, see *Chaparro-Alcantara*, 226 F.3d at 620-21, *Sosa* recognizes that international law in general, and thus treaties in particular, occasionally do so. See 124 S.Ct. at 2756. Although two of our sister circuits have issued opinions in which they reject this conclusion, two considerations persuade us that we should not follow their lead: first, they were both addressing the specific argument that Article 36 provided some kind of shield against criminal enforcement—a position that we too have rejected, and second, these decisions both predated *Sosa*. See *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001); *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001).

Both the Fifth and the Sixth Circuits relied on the language of the Preamble, the fact that the State Department in a litigation context has taken the position that the Vienna Convention does not create individual rights, and the presumption against implied rights of action, in reaching their conclusions.

We have already explained why we do not regard the Preamble as something capable of creating ambiguity in the otherwise plain language of Article 36. The negotiation history of Article 36 is replete with concern about the question of individual rights. For example, as the *Standt* court recalled, "a proposed amendment by Venezuela that would have eliminated the individual right of consular communication was withdrawn after it received strong opposition from other member states. 2 United Nations Conference on Consular Relations: Official Records ["Official Records"], at 37, 38, 84, 85, 331-34, U.N. Doc. A/Conf. 2 5/6, U.N. Sales No. 63.X.2 (1963)." 153 F. Supp. 2d at 425-26. The United States itself proposed language intended to "protect the rights of the national concerned." Official Records at 337. See also *Li, supra,* 206 F.3d at 73-74 (separate opinion of Torruella, C.J.).

It is also revealing that the regulations issued by the Department of Justice and (now) the Department of Homeland Security that address the subject of consular notification highlight the right of the individual alien to notification. See 28 C.F.R. § 50.5 (DOJ); 8 C.F.R. § 236.1(e) (DHS). The regulations in fact draw an interesting distinction between notifications: under the DOJ regulation, § 50.5(a)(1), the alien has the right to request the authorities *not* to notify his or her home country, unless some other treaty takes that right away from him or her; the DHS regulation also acknowledges that particular treaties may require notification. By careful design, as the *travaux preparatoires* reveal, Article 36 of the Vienna Convention was worded in a way to ensure that only "if [the alien] so

requests" would the receiving authorities of the state that had him in custody notify his home country's consular post. This indicates that the right conferred by Article 36 belongs to the individual, not to the respective governments. Too much notification was not Jogi's problem in any event.

The State Department sends regular notices to state and local officials reminding them of their notification obligations under the treaty. Kadish, 18 MICH. J. INT'L L. at 599 & nn. 211-14 (citing *Breard v. Netherland,* 949 F. Supp. 1255 (E.D. Va. 1996)). The Foreign Affairs Manual issued by the State Department says that "Article 36 of the Vienna Consular Convention provides that the host government must notify the arrestee without delay of the arrestee's *right* to communicate with the American consul." (emphasis added). Courts have observed that the United States has repeatedly invoked Article 36 on behalf of American citizens detained abroad who have not been granted the right of consular access. *United States v. Superville,* 40 F. Supp. 2d 672, 676 & n.3 (D. V.I. 1999) (noting United States interventions in Iran in 1979 and Nicaragua in 1986); see Gregory Dean Gisvold, *Strangers in a Strange Land: Assessing the Fate of Foreign Nationals Arrested in the United States by State and Local Authorities,* 78 MINN. L. REV. 771, 792-94 (1994).

Finally, our discussion would be incomplete without acknowledging that the international body with the authority to render binding interpretations of the Convention, the International Court of Justice (ICJ), has definitively announced that Article 36 gives rise to individually enforceable rights. See *LaGrand Case (Germany v. United States of America),* 2001 I.C.J. 104, at ¶ 77 (Judgment of June 27), which held that "Article 36, paragraph 1, creates individual rights, which . . . may be invoked in this Court by the national State of the detained person. These rights were violated in the present case." Lest there was any doubt that the rights that could be invoked by the national state of the

detained person before the ICJ were somehow insulated from recognition in the national courts of the detaining state, the ICJ clarified in *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States)*, 2004 I.C.J. No. 128 (Judgment of March 31), that the United States had an obligation to permit the detainees to raise their Article 36 claims in the national courts. See, *e.g.*, *Avena*, ¶ 139 ("[W]hat is crucial in the review and reconsideration process is the existence of a procedure which guarantees that full weight is given to the violation of the rights set forth in the Vienna Convention, whatever may be the actual outcome of such review and reconsideration.").

At the time the ICJ decided *LaGrand* and *Avena,* the United States had expressly consented to the Court's jurisdiction to resolve disputes under the Vienna Convention. See Vienna Convention on Consular Relations, Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 326. Although the Department of State, at the President's instruction, has since notified the United Nations (the official depository for the Optional Protocol) that the United States was withdrawing from the Protocol, the President announced at the same time that he was directing the state courts to follow *Avena.* See John R. Crook (ed.), *Contemporary Practice of the United States Relating to International Law: U.S. Strategy for Responding to ICJ's Avena Decision*, 99 AM. J. INT'L L. 489, 489-90 & nn. 4, 7 (2005). We interpret that action as an acknowledgment on the part of the Executive Branch that the withdrawal from the Optional Protocol is a prospective action only, and that it has no effect on disputes that were tendered to and finally decided by the ICJ before the withdrawal.

Although we are of the opinion that the United States is bound by ICJ rulings in cases where it consented to the court's jurisdiction, just as it would be bound by any arbitral procedure to which it consented, we recognize that

this proposition is controversial in some circles. The Supreme Court has not yet taken the step we have described, even though it has noted that courts "give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret [it]." *Breard v. Greene*, 523 U.S. 371, 375 (1998); see also *Medellin v. Dretke*, 125 S.Ct. 2088, 2105 (2005) (opinion of O'Connor, dissenting from dismissal of writ of *certiorari* as improvidently granted, discussing whether ICJ's interpretation of Article 36 should be taken as authoritative); *Torres v. Mullin*, 540 U.S. 1035, 1037 (2003) (opinions of Stevens, J., and Breyer, J., dissenting from the denial of *certiorari* and discussing same). We therefore confine ourselves to giving the "respectful consideration" to the ICJ's decisions in *LaGrand* and *Avena* that *Breard* calls for. These decisions reinforce, rather than contradict, the interpretation of Article 36 we have already reached. We note as well that the courts that (at least in the criminal context) have not shared our view did not have the benefit of the later *Avena* decision. Buttressed by the views of the body that will bind all of the other states party to the Vienna Convention, we find that Jogi had an individual right to notification under the Convention.

### 4.  *Remedial Structure*

Last, we must decide whether Jogi is entitled to enforce his individual right under the Vienna Convention in a private action in court. See *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (emphasizing, in the context of statutory interpretation, that the judicial task is to decide both whether Congress intended to create a private right and whether it intended to create a private remedy). We note in this connection that because Jogi is relying on a particular treaty for his claim, rather than the law of nations, there is no need for him to show that the violation about which he

is complaining was "shockingly egregious." That phrase, on which the district court had relied, comes from *Zapata v. Quinn*, 707 F.2d 691, 692 (2d Cir. 1983) (per curiam); the court also referred to *Kadic v. Karadizic*, 70 F.3d 232, 246 (2d Cir. 1995). Those cases attempted to raise claims under the "law of nations" half of the ATS, not the treaty half. Moreover, that language has almost certainly been superseded by the test the Court announced for "law of nations" claims in *Sosa.* Treaty-based claims are better analyzed in a manner analogous to claims under statutes: if there is an implied private right of action, the claimant can go forward; if not, he must rely on public enforcement measures to vindicate his rights.

In the area of statutory construction, it is the intent of Congress that governs whether a private action exists. See *Alexander, supra*; *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). By parity of reasoning, when we are construing a treaty, we must decide whether the drafters of the treaty intended to make a particular part of it privately enforceable. It is unremarkable that the Vienna Convention does not spell out particular methods of enforcement. Treaties, after all, are signed by countries with differing legal systems that provide different kinds of remedies. What Article 36 of the Vienna Convention does provide, however, is an instruction that "[t]he rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, *subject to the proviso, however, that the said laws and regulations must enable full effect to be given* to the purposes for which the rights accorded under this Article are intended." Vienna Convention, art. 36 (emphasis added). This means that a country may not reject every single path for vindicating the individual's treaty rights. In the absence of any administrative remedy or other alternative to measures we have already rejected (such as suppression of evidence), a damages action is the only avenue left.

While Jogi's claim for damages is extravagant, running into the millions of dollars, this is of no legal significance. Courts agree that even nominal damages are appropriate for the vindication of a right. See *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999). Because we have found that jurisdiction is proper under either the ATS or the general federal question statute, 28 U.S.C. § 1331, we need not decide whether a violation of Article 36 is best characterized as a "tort" (perhaps something along the lines of breach of duty to disclose in the context of a special relationship) or a regulatory violation. We also place little weight on earlier court conclusions that a failure to give *Miranda* warnings cannot support a claim under § 1983. *E.g., Giuffre v. Bissel*, 31 F.3d 1241, 1256 (3d Cir. 1994); *Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989). The latter cases were decided before the Supreme Court determined in *Dickerson v. United States*, 530 U.S. 428 (2000), that the *Miranda* warnings themselves have constitutional status. Although a plurality of the Court expressed the opinion that civil remedies continue to be unavailable for *Miranda* violations in *Chavez v. Martinez*, 538 U.S. 760 (2003), the full Court has never taken that step. Most importantly, civil remedies are unnecessary for *Miranda* violations, because statements taken in violation of the suspect's *Miranda* rights are inadmissible.

We conclude, therefore, relying on the language of Article 36, the purpose of the Article, and the need to interpret the Vienna Convention in a manner consistent with the other states party to the Convention, that there is an implied private right of action to enforce the individual's Article 36 rights.


## III

We have only a few matters left before we can conclude. First is the defendants' argument that Jogi's claim is barred

by *Heck v. Humphrey*, *supra.* The short answer is no. *Heck* holds that a plaintiff seeking damages for an allegedly unconstitutional conviction or for other harm caused by actions whose unlawfulness would undermine the validity of the conviction "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 486-87. Recently, in *Wilkinson v. Dotson*, 125 S.Ct. 1242 (2005), the Court clarified the *Heck* rule. It explained that *Heck* prevents prisoners from making an end-run around the need to challenge the validity or duration of their convictions using the vehicle of habeas corpus, rather than through an action under 42 U.S.C. § 1983 or *Bivens.* If success in the lawsuit would not spell immediate or speedier relief, then § 1983 remains available for use, and *Heck* does not bar the action. *Id.* at 1248.

Awarding civil damages to Jogi will have no effect whatsoever on his conviction or sentence. He has finished serving the entire sentence, and he is now back in India. Moreover, it does not logically follow that if Jogi's right to consular access had been respected, he necessarily would have avoided conviction. His claim is more like the Fourth Amendment claims that we have held accrue at the time of the violation and are not *Heck*-barred. See, *e.g.*, *Gonzales v. Entress*, 133 F.3d 551, 554 (7th Cir. 1998).

## IV

In closing, we wish to flag two issues that are likely to arise on remand. The first is implied by our discussion of *Heck*: when exactly did Jogi's claim arise, and did he file suit in time? The statute of limitations is an affirmative defense, see FED. R. CIV. P. 8(c), and so our question about this does not affect the decision about subject matter

jurisdiction or his ability to state a claim. Nevertheless, it will be necessary to decide what statute of limitations applies (the two-year statute that federal courts in Illinois borrow for purposes of § 1983 claims, or some other statute), when Jogi's claim accrued, whether the discovery rule applies to his case, and ultimately whether he filed in time. Neither the procedural posture of the case nor the record allow us to resolve that point now. Second, we think it inevitable that the issue of qualified immunity on the part of the defendants will arise. Although normally we might be inclined to find waiver, because the defendants have not even whispered the phrase thus far, this is an unusual case. We leave it to the district court's sound discretion to decide whether to allow the defendants (who have not yet filed an answer, of course, because they won below on their motion under Rule 12(b)(1)) to raise this defense on remand.

The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

      Teste:

 

                         _____
                         *Clerk of the United States Court of Appeals for the Seventh Circuit*