THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELVA SANCHEZ, Defendant-Appellant.

First District (4th Division)   No. 1—03—2311

Opinion filed December 15, 2005.

Michael J. Pelletier and Adolfo Mondragon, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Samuel Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURPHY delivered the opinion of the court:

This case is before this court on defendant-appellant Elva Sanchez's appeal from a final judgment of conviction in a criminal case. Following a jury trial, defendant was convicted of first-degree murder (720 ILCS 5/9—1(a)(3) (West 2004)) and aggravated arson (720 ILCS 5/20—1.1 (West 2004)). These two counts were merged and defendant was sentenced to 25 years' imprisonment.

Defendant now argues that the circuit court erred in denying her

motion to quash arrest and suppress evidence, her motion to suppress statements, and her amended motion to suppress statements. First, defendant claims that the police made an illegal arrest without probable cause and that there were no intervening events to break the causal connection between the illegal arrest and her statements. Defendant next claims that she unknowingly and unintelligently made statements to the police confessing her involvement in the crime due to her limited grasp of English and improper translation by the police. Finally, defendant claims that she was not notified of her right to contact the Mexican Consulate under the Vienna Convention on Consular Relations (Vienna Convention on Consular Relations, *opened for signature* April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (December 24, 1969, *entered into force with respect to the United States*)) (Vienna Convention). Defendant argues that each of these claims requires reversal of her conviction and remand of the cause for further proceedings with instructions that her statements to the police be suppressed.

For the reasons that follow, we affirm the decision of the trial court.

## BACKGROUND

Defendant, a Mexican national, has been living in the United States since 1974. In late September 1999, defendant became a tenant of owner-occupier Pedro Carrizales at 2029 West 17th Street in Chicago, Illinois, by paying one month's rent for a room. Defendant occupied the room with her boyfriend Joe Lugo.

On October 21, 1999, Carrizales took defendant's key and refused to return it to her, demanding she leave his house. At approximately 9:30 p.m. on this day, defendant left the house and flagged down Officers Buehler and Villagrana of the Chicago police department who where on patrol in the neighborhood. The officers stopped their vehicle and spoke with defendant, who appeared very upset and angry about the situation. The officers accompanied defendant to Carrizales' house.

The officers spoke with Carrizales' wife. Defendant remained behind at the officers' request as she was too emotional to accompany them. The officers informed Carrizales' wife that Pedro had attempted an illegal eviction and defendant would have to be allowed back in the building. Defendant's key was returned to her and she agreed to leave the home for the evening after gathering some belongings. Buehler and Villagrana left at this time.

Lugo returned to the building and escorted defendant to their friend Danny Machino's house at 2136 West 21st Street. At approximately 11 p.m., defendant left Machino's home. After purchasing

a "little bottle" of wine at the liquor store, defendant went to her friend Keeka's house at West 21st Street and South Leavitt Street. Keeka and Tony Word were present and talked with defendant while she consumed her wine. At approximately 1 a.m. on October 22, 1999, defendant left Keeka's house with Word.

On October 22, 1999, at approximately 3 a.m., a fire started in the rear enclosed porch of Pedro Carrizales' home. The fire spread through the Carrizales' home and two buildings immediately east, 2027 and 2025 West 17th Street. Fire Marshall Peter Lamanna of the Chicago fire department was called to the fire. After the fire was extinguished, Lamanna investigated the buildings. Severe damage was caused to all three buildings and Robert Nealy of 2027 West 17th Street was found dead.

Lamanna determined that the fire was incendiary—that human action had started the fire on the rear enclosed porch of the building at 2029 West 17th Street. The Chicago police department began their investigation at this point. Based on reports from Officer Buehler and Villagrana of the altercation on the night of October 21, 1999, defendant became the prime suspect.

At approximately 11 p.m. on October 24, 1999, defendant agreed to go to bomb and arson headquarters for questioning by four Chicago police department detectives. On October 25, 1999, defendant confessed to Assistant State's Attorney Matthew Walsh that she started the fire. Officer Robert Alanis served as translator for all translated discussions on October 24 and 25, 1999.

Defendant's arrest on charges of murder and aggravated arson was then processed by the Chicago police department. On November 15, 1999, the grand jury indicted defendant and John Tony Word on 24 separate counts. As to defendant, the State nol-prossed all but one count of first-degree murder (720 ILCS 5/9—1(a)(3) (West 2004)) and one count of aggravated arson (720 ILCS 5/20—1.1 (West 2004)) and the case was set for trial.

### Defendant's Pretrial Motions

Prior to trial, defendant filed a motion to quash arrest and suppress evidence, a motion to suppress statements and an amended motion to suppress statements. Defendant claimed the police did not have probable cause to arrest her for arson and first-degree murder. Defendant claimed that evidence and her statements should be suppressed as the result of this illegal arrest, that she did not knowingly waive her rights because she did not understand the police, and that she was not notified of her right to contact the Mexican Consulate pursuant to the Vienna Convention.

At the pretrial hearing on defendant's motions, the State presented four witnesses. First, Detective Howley, a polygraph examiner with the Chicago police department, testified that he interrogated defendant at approximately 10:40 a.m. on October 25, 1999. Howley stated that Alanis read defendant her *Miranda* rights upon his request from a preprinted card containing the Spanish translation. Defendant was then given this card, appeared to read it, and signed the card stating she understood her rights. Howley testified that defendant did not appear confused, distressed or uncomfortable at any time during this time.

Detective Gregory Swiderek was assigned to investigate the fire and death. Swiderek was informed by the bomb and arson detectives that someone had intentionally set the fire. On October 23, 1999, Swiderek interviewed Carrizales. Carrizales told him that he had asked defendant and Lugo to leave because they drank too much and gave out copies of their key to others. On October 21, 1999, following Carrizales' taking of defendant's key and a heated argument, the police came and had defendant's key returned. As defendant was leaving the house that night she yelled at Carrizales "you will see what's going to happen to you."

On October 24, 1999, Swiderek attempted to question defendant when she was brought to the bomb and arson headquarters at approximately 11 p.m. Swiderek testified that Alanis first read defendant her *Miranda* rights from a preprinted card, but defendant appeared too intoxicated to question. Defendant agreed to spend the night at the police station to be questioned in the morning. Swiderek stated that defendant was not handcuffed during this time, the door remained unlocked, and he checked on her later that evening and she was sleeping on the floor.

At approximately 9 a.m. on October 25, 1999, defendant was offered food and soda. Alanis again read defendant her *Miranda* rights from his preprinted card containing the Spanish translation. Defendant indicated she understood her rights and was willing to talk with the police. After a brief discussion, defendant agreed to take the aforementioned polygraph examination.

Defendant was interrogated again by Swiderek at 4 p.m. and 6:05 p.m. with Alanis again reading defendant her rights from the same preprinted card both times. At the 6:05 p.m. interrogation, following Swiderek's disclosure that they had talked to Lugo, defendant confessed to starting the fire. Swiderek denied that defendant was threatened by any interrogator or that anyone slammed the table at any time.

Alanis testified that he translated each conversation with

defendant, from the time she was picked up at Machino's house through her videotaped confession. Alanis stated that he can speak and read Spanish and has spoken Spanish his whole life. Alanis testified that Detective Mazur received a call from Danny Machino that defendant was in his apartment the night of October 24, 1999. Mazur, Alanis and two other policemen immediately went to Machino's home and were let in the apartment by Machino.

Alanis testified that defendant voluntarily agreed to come to the station with the four policemen on October 24, 1999. He stated that he read defendant her rights from the preprinted translation prior to each interrogation at the police station. Alanis further testified that defendant agreed to stay the night at the station on October 24, 1999, that she stated she understood her rights each time they were read to her, and that at no time was she threatened to say anything.

Assistant State's Attorney Matthew Walsh testified that he interrogated defendant, with Alanis translating, at 8 p.m. on October 25, 1999. Walsh explained that he was a lawyer and a prosecutor and not defendant's lawyer. Walsh advised her of her rights from memory. Alanis translated this and defendant stated that she understood. Defendant then admitted to starting the fire and agreed to give a videotaped confession. Walsh conducted the videotaped confession, for which defendant signed a release and, again, received her *Miranda* rights, signing the preprinted Spanish translation Alanis had read.

The State did not provide any evidence that defendant was advised of her right to contact the Mexican Consulate pursuant to the Vienna Convention.

The defense offered three witnesses in support of their motions. Dr. Paul Fauteck, a psychologist, testified that he was employed by Cook County's Forensic Clinical Services and that he interviewed defendant and reviewed her videotaped confession. Dr. Fauteck indicated he was fluent in Spanish, having spoken the language for approximately 45 years and lived for a short period of time in Mexico. Dr. Fauteck opined that Officer Alanis improperly translated the explanation of defendant's *Miranda* rights and other questions such that defendant could not knowingly and intelligently understand and waive her constitutional rights.

Dr. Dawna Gutzmann, a staff psychiatrist with Forensic Clinical Services, testified next for the defense. Dr. Gutzmann is not fluent in Spanish and defendant's confession was translated for her and she interviewed defendant with a translator. Dr. Gutzmann concluded that, as a Spanish-speaking Mexican national, defendant was never educated in terms of the Bill of Rights or constitutional rights. As such, she opined, explanations given by the police were inadequate

and defendant was unable to comprehend her rights or understand the role of the prosecutor who questioned her.

Defendant testified that the police forcefully knocked on Machino's door and entered the apartment with guns drawn the night that she was taken to the bomb and arson headquarters. She alleged that she was told to empty her pockets, searched, told she was under arrest and taken outside with her hands tied. Defendant testified that she was openly mocked and laughed at by the detectives as they drove her to the headquarters.

At the bomb and arson headquarters, defendant testified, she was not given her constitutional rights or a consular instruction. She admitted that she can read Spanish, but she did not read the card that she signed, which she signed only because Alanis told her to do so. Defendant claimed that she was handcuffed to the wall for the night when the police determined she was too drunk to question. Defendant further testified that she was threatened and pressured by the police to make statements. Finally defendant claimed that she did not understand that Walsh was a prosecutor and not her attorney.

The trial court denied defendant's motions. In denying the motion to quash arrest and suppress evidence, the court found "that Ms. Sanchez was arrested at the time; prior to being brought to the station that she was intoxicated; that she was brought to the station. I find there was probable cause." The court recognized the violation of the Vienna Convention, but denied the amended motion to suppress statements. Finally, based on the totality of the circumstances, the court found that *Miranda* warnings were given, the warnings were understood by defendant, and that defendant made her statements voluntarily.

## The Trial

At trial, the State offered several witnesses. Fire Marshall Lamanna testified that he was called to investigate the fire. Lamanna conducted a cause and origin investigation when the fire was extinguished. Lamanna ruled out the fire being accidental and determined it was incendiary, started in the inside porch of 2029 West 17th Street by open flame ignition.

Alanis and Walsh both testified consistently with their testimony at the hearing on defendant's motions. Officer Buehler testified that at approximately 9:30 p.m. on October 21, 1999, Buehler and Villagrana were patrolling their beat when they were flagged down by defendant. Defendant was upset and communicated, in English, that she was having a problem with her landlord. Buehler and Villagrana accompanied defendant to 2029 West 17th Street.

Buehler testified that defendant was very upset and angry during this time. As defendant was emotional and screaming at Carrizales, the officers left her on the landing as they talked with Carrizales' wife. When Buehler discovered the next day that a fire had broken out' at 2029 West 17th Street early that morning, she contacted the bomb and arson detectives and relayed the situation between defendant and Carrizales.

Joe Lugo, defendant's boyfriend at the time of the incident, testified to the events surrounding the incident with Carrizales. Lugo left the apartment with defendant when she went to call the police and returned after defendant had gotten her key back. Defendant and Carrizales were arguing again and defendant threatened him with physical harm and that she would "burn [him] up." Again, on the way to Machino's house, defendant stated to Lugo that Carrizales owed her money and said she would mess him up, break his legs and burn him down. Lugo went to sleep at Machino's house and did not see defendant until the next day when, watching news footage of the fire, she laughed and said "oops, I did it. I told you I would get him; I told you I would [mess] him up."

Finally, defendant testified consistently with her testimony in the hearing on her motions. Defendant continued to claim the police coerced her into her confession and that she did not understand the translations by Officer Alanis. Defendant also testified that she believed Walsh was her attorney. The jury found defendant guilty of first-degree murder and aggravated arson.

## ANALYSIS

On appeal, defendant maintains that the denial of her motion to quash arrest and suppress evidence and her motions to suppress statements must be reversed. Defendant first claims the police did not have probable cause to arrest her and, thus, all evidence gathered from that illegal arrest must be suppressed. Defendant also contends her statements to the police must be suppressed because she did not understand her rights as translated and that she was not properly advised of her rights under the Vienna Convention.

In reviewing a trial court's decision to grant or deny a motion to quash arrest or suppress evidence, this court must generally review mixed questions of law and fact. We defer to the trial court on questions of fact and will reverse only if the decision is against the manifest weight of the evidence. *People v. Klimawicze*, 352 Ill. App. 3d 13, 19 (2004), citing *People v. Pitman*, 211 Ill. 2d 502 (2004). We review *de novo* the ultimate legal question of whether the arrest was valid or the evidence properly obtained. *Klimawicze*, 352 Ill. App. 3d at 19, citing

*Pitman*, 211 Ill. 2d 502. A reviewing court may consider evidence presented both at the hearing on the motion and at trial. *People v. Cook*, 352 Ill. App. 3d 108, 120 (2004).

### Defendant's Motion to Quash Arrest and Suppress Evidence

Defendant first argues that the police did not have probable cause to arrest her. She contends that the police only knew that she lived at Carrizales' house and that she had an argument with him the night before the fire occurred. Defendant claims this constituted mere suspicion and was inadequate to establish probable cause or lead a reasonable person to believe she committed the crime under *People v. Sims*, 192 Ill. 2d 592, 614-15 (2000). Therefore, as they did not have probable cause or a warrant, the arrest was illegal and an unreasonable search and seizure. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6.

Defendant contends the facts in this case are analogous to those in *People v. Thomas*, 123 Ill. App. 3d 857 (1984). In *Thomas*, the defendant was arrested for murdering his girlfriend after the police learned that the victim was last seen alive arguing with the defendant and that he stopped coming around the victim's apartment after she had gone missing. *Thomas*, 123 Ill. App. 3d at 859-60. The court found that these facts did not establish probable cause, but merely gave reason to question the defendant. *Thomas*, 123 Ill. App. 3d at 863.

The State first claims that defendant was not arrested until after she confessed to the crime. The State argues that defendant willingly agreed to go to the police station for questioning and that she was not handcuffed or forced to stay at the police station. Further, defendant willingly remained at the police station overnight to sleep off her drunkenness. Following a reasonable amount of questioning and being informed of Lugo's statements, the State claims defendant knowingly confessed and was then arrested.

Alternatively, the State argues that the police had probable cause and legally arrested her when they brought her in for questioning. The State counters that defendant's reliance on *Thomas* is misplaced. They claim that the issue in *Thomas* was whether the defendant's statements were sufficiently attenuated from the arrest. *Thomas*, 123 Ill. App. 3d at 866. Further, the State claims the facts of *Thomas* are not analogous to this case.

The State notes that the defendant in *Thomas* was arrested on the basis of attenuated information related to the police by the victim's mother. In this case, the police knew of the situation between defendant and Carrizales before the incident. Further, the police knew from Carrizales that defendant had threatened him the evening of the

fire. In fact, the police were directly involved in the altercation between defendant and Carrizales and witnessed firsthand exactly how upset defendant was.

■ Probable cause to arrest a person exists when, at the time of the arrest, the facts and circumstances known to the police officer would lead a reasonable person to believe that the person had committed a crime. *People v. Ollie*, 333 Ill. App. 3d 971, 980 (2002). The standard is probability of criminal activity; the police do not need evidence beyond a reasonable doubt that the suspect committed the crime. *People v. Lee*, 214 Ill. 2d 476, 485 (2005). Determination of this probability is based on all of the information available to the police at the time of the arrest. *Lee*, 214 Ill. 2d at 485.

■ A person has been arrested when his freedom of movement is restrained by physical force or a show of authority. *People v. Smith*, 214 Ill. 2d 338, 353 (2005), citing *United States v. Mendenhall*, 446 U.S. 544, 554-55, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). In determining whether an arrest has occurred, the key inquiry is whether, under the circumstances, a reasonable innocent person would have concluded that he was not free to leave. *Smith*, 214 Ill. 2d at 353. The circumstances considered in determining whether a person has been arrested include the presence of multiple police officers, the display of weapons by an officer, the touching of the person by the officers, the officers' use of language suggesting that the person is compelled to obey, and the occurrence of practices that normally accompany arrest, such as handcuffing, searching, booking, photographing, and fingerprinting. *Smith*, 214 Ill. 2d at 353, citing *Mendenhall*, 446 U.S. at 554-55, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

■ The court found that defendant was arrested at the time the police brought her in for interrogation. Although the record reveals that the police did not process her arrest until after defendant had confessed to the crime, the court based its decision on the totality of the circumstances and the testimony and the demeanor of the witnesses. The court further found that the police had probable cause at this time.

Applied to the established factors enunciated in *Smith*, the circumstances of this case support the trial court. Four police officers arrived at Machino's apartment and escorted an intoxicated defendant to their squad car. Upon arrival at the police station, defendant was read her *Miranda* rights. At least two police officers, often more, were present during each of her interrogations. Based on her limited grasp of English and intoxicated state, these circumstances could reasonably lead defendant to the conclusion she was unable to leave, especially since there was no evidence the police stated that she was free to go or that she was not under arrest.

Next, we find the facts of this case closer to those in *People v. James*, 255 Ill. App. 3d 516 (1993). In *James*, we distinguished the *Thomas* case in upholding a determination of probable cause in defendant's arrest for arson. *James*, 255 Ill. App. 3d at 525-26. The police in *James* knew that the defendant had assaulted his ex-girlfriend at her apartment the evening her apartment was set ablaze and that he was seen at the apartment just prior to the fire. *James*, 255 Ill. App. 3d at 525. Additionally, the police were told that the defendant was drunk and extremely upset regarding his breakup with the ex-girlfriend. *James*, 255 Ill. App. 3d at 525. In *James*, we did not have a trial court ruling that the police did not have probable cause, so we did not have to pay deference to the trial court. *James*, 255 Ill. App. 3d at 526. Accordingly, we found the police had probable cause to arrest the defendant and upheld the arrest of the defendant for arson. *James*, 255 Ill. App. 3d at 525 (trial court reversed and remanded on separate grounds).

In this case, we have a trial court finding of probable cause to which we must pay deference. Further, as in *James*, the police had more knowledge than was the case in *Thomas*. In this case, the police were not only aware of the altercation between defendant and Carrizales before the fire started, they were actively involved in the situation. Officer Buehler witnessed the aggressive and emotional behavior of defendant in confronting Carrizales to retrieve defendant's key to the apartment. The police also knew after interviewing Carrizales that defendant again argued with him after Officers Buehler and Villagrana had left the premises. More importantly, the police knew that defendant had threatened Carrizales before she left.

The totality of the circumstances supports the trial court's findings of probable cause and that the arrest occurred when defendant was brought in for questioning. The arrest therefore was legal and the trial court properly denied defendant's motion to suppress her confession.

## Defendant's Motion to Suppress Statements

Defendant next claims that the circuit court erred in denying her motion to suppress statements because she did not knowingly and intelligently waive her rights. Defendant contends that even if she understood the *Miranda* warnings, given in Spanish prior to each and every period of questioning, she did not understand the role of the assistant State's Attorney. Defendant claims that this is because of Officer Alanis' improper translation. As a result, she could not knowingly and intelligently waive her right to counsel. In reviewing whether a confession was voluntary, the reviewing court will review *de novo*

the question of whether the statement was made freely and without compulsion or inducement. *In re G.O.*, 191 Ill. 2d 37, 50 (2000).

Defendant's testimony and that of her experts suggests she did not understand her constitutional rights or the role of the assistant State's Attorney. However, this court has rejected this exact argument before. See *People v. Villagomez*, 313 Ill. App. 3d 799 (2000); *People v. Teran-Cruz*, 272 Ill. App. 3d 573 (1995). In any event, in considering the voluntariness of a confession, we must examine the totality of the circumstances. *People v. Willis*, 215 Ill. 2d 517, 536 (2005).

The record is replete with factors that undercut defendant's claim. Defendant was read her *Miranda* rights in Spanish at least 6 times over a 23-hour period. At least twice, defendant was able to read the preprinted Spanish translation of her rights, and she initialed that she had read and understood these rights. Further, a plain reading of the translations of her videotaped confession does not support defendant's contention. A comparison of the State's and defendant's translations supports the State's contention that defendant was advised the assistant State's Attorney was not her attorney and that she fully understood.

Additionally, defendant had a rudimentary understanding of English, enough to communicate with Officers Buehler and Villagrana and understand some questions prior to their translation. Defendant had some prior involvement with the criminal justice system. Defendant had been a resident of the United States for over 25 years.

The trial court denied defendant's motions based on the totality of the circumstances and the testimony and the demeanor of the witnesses. As in *Villagomez* and *Teran-Cruz*, defendant's argument that she did not understand the role of the assistant State's Attorney fails and the trial court properly denied defendant's motion to suppress statements.

### Defendant's Amended Motion to Suppress Statements

■ Defendant next contends that equity requires that this court apply the exclusionary rule because the Vienna Convention was violated. We agree with defendant, and the trial court, that article 36 of the Vienna Convention was violated in this case. However, we also agree with the trial court that suppression of statements is not a proper remedy for this violation.

Both the United States and Mexico are parties to and have ratified the Vienna Convention. Vienna Convention, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261. As such, the provisions of the Vienna Convention are considered the supreme law of the land, equal to federal statutes, and binding on the states. U.S. Const., art. VI. The question in this case is

whether the Vienna Convention confers a right and remedy individually to defendant.

Article 36(1)(b) states in full:

> "If he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." Vienna Convention, art. 36(1)(b), 21 U.S.T. at 101, 596 U.N.T.S. at ___.

The plain language of this section appears to confer an individual right upon foreign nationals in party States. Neither the Illinois nor United States Supreme Court has definitively decided that the Vienna Convention confers an individual right. However, most recently, the Seventh Circuit Court of Appeals provided a summary of case law on this issue and found that the Vienna Convention was self-executing and provides an individual right of action. *Jogi v. Voges*, 425 F.3d 367 (7th Cir. 2005).

Unfortunately, as noted by Justice O'Connor, the individual state's noncompliance with this section of the treaty remains a "vexing problem." *Medellin v. Dretke*, 544 U.S. 660, 674, 161 L. Ed. 2d 982, 994, 125 S. Ct. 2088, 2096 (2005) (O'Connor, J., dissenting, joined by Stevens, Souter, and Breyer, JJ.). The trial court properly made a finding that the State did not comply with this section, a fact the State does not dispute. However, as conceded by defendant, the trial court also followed established precedent that suppression of statements is not a remedy for this violation. See *People v. Vasquez*, 356 Ill. App. 3d 420, 426 (2005); *Villagomez*, 313 Ill. App. 3d 799; *Jogi*, 425 F.3d at 379-80. No court in Illinois has held that suppression of evidence is a remedy for a violation of the Vienna Convention. *People v. Vasquez*, 356 Ill. App. 3d 420, 426 (2005). Further, the Seventh Circuit noted with its exhaustive list of precedents that, though an individual right was created, the overwhelming authority states that the remedy for a violation is not the suppression of evidence. *Jogi*, 425 F.3d at 379-80.

Despite the recent cases establishing the fact the Vienna Convention is self-executing and that an individual right is created, we decline defendant's request to ignore the overwhelming precedent throughout the country that suppression is not an available remedy. Defendant may have other avenues to pursue a remedy for a violation of her

rights; we, however, must reject the instant claim that suppression of statements is a proper remedy. Therefore, we affirm the trial court's denial of defendant's amended motion to suppress statements.

## CONCLUSION

Accordingly, for the aforementioned reasons, the decision of the trial court is affirmed.

Affirmed.

QUINN, P.J. and CAMPBELL, J., concur.