SECOND DIVISION
March 31, 2006

No. 1-04-0856

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| | ) | |
| RUFFO SALGADO, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE SOUTH delivered the opinion of the court:

Defendant, Ruffo Salgado, appeals his conviction for first degree murder in the shooting death of Erling Cox following a jury trial. The trial court sentenced him to a 54-year prison term in the Illinois Department of Corrections.

Early in the proceedings, defendant was represented by the Cook County public defender's office. The public defender filed pretrial motions to quash defendant's arrest and suppress evidence, and to suppress the identification. Those motions were denied by the trial court. Just prior to trial, on January 8, 2002, defendant retained new counsel and was subsequently represented by private counsel.

The evidence presented at trial established the following. On February 22, 1992, Erling Cox was fatally shot three times while at the Pelican Bar in Chicago. Defendant and his cousin Saul Salgado, who were both under the legal drinking age at the time, entered the Pelican Bar and ordered beer. They were approached by the owner of the bar, Carlos Brito, who knew Saul's

parents from Mexico. Brito asked them for identification, and when they refused to provide it, he told them to leave. Brito testified that defendant had a bandage on his nose and that, before leaving the bar, defendant had an argument with Brito. Defendant warned Brito that he "would be sorry," and he would be back. Defendant and Saul then left the bar.

Defendant and Saul left in defendant's car and went to a restaurant where they remained for 45 minutes. They then returned to the Pelican Bar, where Brito was standing in front of the door. Defendant, who had a .22-caliber revolver with him, put the gun to the back of Brito's head and told him that he was going to sell him some beer. Saul was approximately 10 feet behind defendant when he saw him walk up very close to Brito and begin arguing with him. Defendant shot once away from Brito and then returned the gun to the back of Brito's head. Defendant ordered Brito back into the bar, where Brito told the bartender to call the police. The bartender then handed the telephone to the victim.

Defendant pushed Brito against the pool table and fired several shots in the bar. Three of these shots hit the victim, who fell to the ground and subsequently died from the wounds. Gina Hartung, who was standing inches away from the victim, saw defendant shoot the victim. After defendant fired inside the bar, Brito threw a pool ball at defendant, and defendant ran from the bar with the gun in his hand. Saul ran after defendant, and they left in defendant's car. Defendant drove to the south side of Chicago, where they went to another bar. Saul testified they remained on the south side and slept in defendant's car for three or four days.

Several police officers and detectives arrived at the Pelican Bar shortly after the shooting. Detective Schorsch entered the bar and saw that the victim was dead. Detective Sobielowski,

who speaks Spanish, interviewed Brito. Detective Schorsch interviewed Hartung. A physical description of the shooter was compiled from the interviews. Following interviews with 20 to 25 people at or near the scene, the police checked some of the names given to them, and Saul's came up. The police subsequently compiled a photo array with Saul's photograph in it, which was shown to Brito. The police attempted to locate Saul, but could not. However, Detective Abrew spoke to Saul's brother and learned that defendant had been hanging around with Saul. The description of defendant given by Saul's brother matched the description of the offender wanted for the shooting. Based on that information, the police compiled a second photo array, this time containing defendant's picture. When shown this photo array, Brito positively identified defendant as the shooter.

Following that identification, the police launched a search for defendant. They went to his previous addresses and places he had been known to frequent but were unable to locate him. The police also took additional measures to locate defendant: they prepared a "stop order," which notifies everyone in the Chicago police department to contact the detectives at their station before releasing defendant on bond if he were to be detained; a daily request bulletin was prepared and submitted, which is dispersed internally within the entire police department and contains information on people being sought by the police, including photographs; and the felony review unit of the Cook County State's Attorney office issued a warrant for defendant's arrest by request of the detectives involved in the case on February 25, 1992.

The detectives interviewed Saul on February 27, 1992, and again attempted unsuccessfully to locate defendant. A federal search warrant for defendant was obtained several

months after the murder based on unlawful flight to avoid prosecution. Federal immigration officials were also notified, as well as the United States Marshall's Service, all cities on the border in Texas, New Mexico, Arizona, California, and Mexico, because the police learned that defendant might flee to Mexico. Despite these measures, defendant was still not located.

On August 4, 1999, following a telephone call from an anonymous source, three detectives from the Chicago police department, including Detective Tyler, and two police officers from the Cicero police department, went to a second-floor apartment at 1920 South 48th Court in Cicero to locate and arrest defendant pursuant to the outstanding arrest warrant. Jose Salgado answered the door and allowed the officers to enter the apartment. Defendant was located in the rear bedroom. The detectives asked defendant to stand, and when asked for his name, he told them his name was "Francisco Roman." He then produced a social security card, an Arizona drivers license and an immigration card, all with the name "Francisco Roman," along with his picture. After determining that "Francisco Roman" was defendant, Detective Tyler arrested defendant and transported him to the Area 3 station.

At the station, defendant was placed in a detention room and Detective Schorsch was notified of the arrest. Detective Schorsch and Detective Thezan, who speaks Spanish, went to the detention room at approximately 3:30 p.m. Detective Thezan advised defendant of his *Miranda* rights in Spanish prior to speaking with him. Schorsch and defendant had a conversation, with Thezan translating, until Thezan was assigned to a different case. Officer Centano was then sent to Area 3 to translate at approximately 5 p.m. Defendant was moved into a conference room, and Officer Centano translated a conversation between Schorsch and

defendant. During the conversation, Schorsch learned that Brito had been located. Once Brito arrived at the station, Schorsch contacted the felony review unit, and Assistant State's Attorney (ASA) Frank Andreou responded and spoke with Brito. After the interview, Brito viewed a lineup at 1 a.m. on August 5, 1999, and positively identified defendant as the shooter.

Following the lineup, ASA Andreou, Detective Schorsch, and Officer Centano met with defendant. ASA Andreou informed defendant that he was an assistant State's Attorney and not his lawyer. Officer Centano translated English into Spanish for defendant and defendant's responses into English for ASA Andreou. Defendant indicated that he understood, and ASA Andreou informed defendant of his *Miranda* rights, which Officer Centano translated from a preprinted form. There were some words that Officer Centano did not understand, because he and defendant spoke different dialects of Spanish, so he made sure they understood each other. Centano stated there was never a point when he could not understand defendant, but sometimes a word or two would need to be clarified. Centano had acted as translator in his police duties approximately 1,000 times during his eight years as an officer and had frequently encountered similar dialect problems. Defendant read the *Miranda* warnings out loud in Spanish to Officer Centano and stated he understood the rights he was waiving.

After speaking with defendant, ASA Andreou explained the difference between an oral statement, a handwritten statement, and a court-reported statement. Defendant agreed to give a handwritten statement, after which Officer Centano translated every line of the statement into Spanish for defendant. Corrections were made, and the statement was subsequently signed on every page by defendant, ASA Andreou, Officer Centano and Detective Schorsch.

In his statement, defendant said that on February 22, 1992, he and his cousin Saul went to the Pelican Bar to talk to some guys that had beaten him up and put him in the hospital two weeks earlier. Saul told defendant to go to the bar because he knew the guys who had jumped him and that he could talk to them. Saul also said he knew the owner of the bar, and they should not have any problems. Defendant stated that Saul gave him a gun so he could scare people if there was a problem. Defendant put the gun in the right pocket of his jacket, and the two of them entered the bar. When he entered the bar, defendant got beer for himself and Saul while Saul spoke to the owner. Defendant then saw two of the guys who had beaten him up looking at him and walking toward him. A girl asked defendant to dance and told him that the men were going to hit him again and asked him if he was afraid because they would hurt him inside or, later, outside. Defendant told her there should not be a problem. One of the men was approaching defendant and the girl, whom the man grabbed by the arm. The man then said that defendant was the one, and he was going to get him. Defendant finished dancing and told the woman to bring him another beer.

According to his statement, defendant was afraid and saw that the man was holding a pool cue in a threatening manner. Another man grabbed defendant, and a third man approached him. At that time, defendant said, he took out his gun in order to scare them when one of the men grabbed the gun, and it went off. When the man let it go, defendant backed away, fired his gun, and backed up some more, and fired again. Defendant said he kept shooting because the men kept coming toward him. He fired three or four times and stopped shooting once he got outside. Defendant then got into his car and drove around the area. He did not know that he had

hit anyone with his shots until Saul told him the next day that a man had been shot. Defendant stated that he fled to Mexico three or four days later and stayed there for five or six years. He then went to Arizona, where he used the name "Francisco Roman" to get work. Defendant came back to Cicero in February 1999, where he was arrested.

On August 29, 1999, at approximately 7:40 p.m., Hartung arrived at the Area 3 station to view a lineup. She positively identified defendant in the lineup as the shooter.

In his defense, defendant presented the testimony of Melesia Salgado, Susanna Casteneda, Oscar Salgado, and Catalina Aviles, all of whom are his older siblings. The four of them testified that they remembered defendant attending a birthday party for Melesia on February 22, 1992, at the time the murder occurred. They did not tell the police or prosecutors at any time prior to trial about defendant being at a party.

Following closing arguments, jury instructions and jury deliberations, defendant was convicted of first degree murder. Defendant subsequently retained new counsel for his posttrial proceedings. Posttrial counsel filed a motion for a new trial in light of two new witnesses, Abraham Perez-Merlos and Ricardo Rivera, who were interviewed by the police and described the shooter as having a blond, bleached ponytail, which defendant asserted matched Saul's description in February 1992. Defendant argued that those two witnesses were listed in general progress reports but not in the typed police reports, and that their testimony probably would have changed the result of the trial. The trial court denied defendant's motion, holding that the evidence was not new, that the defense had the information about Saul, that defendant had not demonstrated due diligence, and that the evidence would not have changed the jury's verdict.

1-04-0856

Defendant subsequently filed a motion to reconsider and vacate the denial of his motion for new trial, based on the discovery of two additional witnesses, Carmelo and David Mendoza, who were allegedly witnesses to the shooting. Carmelo Mendoza provided an affidavit, in which he identified Saul as the shooter and indicated that he knew Saul from school. The trial court denied the motion, again holding that defendant had not exercised due diligence and that the evidence would not have changed the jury's verdict. This appeal followed.

Defendant makes four arguments on appeal: (1) whether the prosecution's failure to give the defense exculpatory evidence it had in its possession - a report of two witnesses describing the State's key witness as the shooter and a photograph of that witness matching the unique description of the shooter - violated Brady v. Maryland and necessitates a new trial or, at a minimum, remand for an evidentiary hearing; (2) whether the trial court improperly denied defendant's request for an evidentiary hearing on his newly discovered evidence claim that three new witnesses described the State's key witness, Saul Salgado, as the shooter, where one witness was not listed in any police reports and moved out of town after the shooting, and the other two witnesses were identified in the police report that the State failed to tender to the defense; (3) whether defendant's constitutional right to effective assistance of counsel was violated where defense counsel failed to file a motion to suppress alleging: (a) that defendant's purported statement was not voluntarily signed; (b) that defendant's waiver of *Miranda* rights was not knowing and intelligent where the interrogating officer issued legally deficient rights; and (c) that the statement was inadmissible due to its lack of reliability, given the translator's blatant incompetence; and (4) whether the trial court erred when it failed to suppress the written

statement where defendant's signature was procured in violation of the Vienna Convention.

Defendant first contends that the prosecution's failure to give the defense exculpatory evidence it had in its possession - a report of two witnesses describing Saul Salgado, the State's "key witness," as the shooter and a photograph of Saul matching their unique description of the shooter - violated Brady v. Maryland and necessitates a new trial or, at a minimum, remand for an evidentiary hearing.

In Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the United States Supreme Court held that an accused is denied a fair trial when the prosecution withholds exculpatory evidence from the accused until after trial. However, in United States v. Agurs, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the Supreme Court held that the prosecutor's failure to disclose exculpatory evidence must be "material" and result in the denial of a fair trial. The Court defined "materiality" as omitted evidence which creates a reasonable doubt of guilt that did not otherwise exist. The Agurs Court further held that the mere possibility that evidence "might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at 110, 49 L. Ed. 2d at 353, 96 S. Ct. at 2400. In United States v. Bagley, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct. 3375, 3380 (1985), the Court held that the duty to disclose includes impeachment evidence as well as exculpatory evidence. Brady also applies to exculpatory information known only to the police and not to the prosecutor, and further requires the individual prosecutor to learn of any favorable evidence known to others acting on behalf of the government in the case. Kyles v. Whitley, 514 U.S. 419, 433-34, 437, 131 L. Ed. 2d 490, 505, 508, 115 S. Ct. 1555, 1566, 1567

1-04-0856

(1995).

Illinois Supreme Court Rule 412 (188 Ill. 2d R. 412) governs the disclosure of information by the prosecution to the defense. Under Rule 412(f), the prosecution must ensure a free flow of information between investigative personnel and its office sufficient to place within its possession all information relevant to the accused and the offense charged. 188 Ill. 2d R. 412(f). To that end, Rule 412(a) provides, in pertinent part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim

ˇ10ˇ

reports of oral statements shall be disclosed to

defense counsel;            ***

(v) any books, papers, documents, photographs or

tangible objects which the prosecuting attorney intends to

use in the hearing or trial or which were obtained from or

belong to the accused [.]"   188 Ill. 2d Rs. 412(a), (a)(I),

(a)(v).

With respect to the "missing" exculpatory police reports, we find any error by the State was harmless and immaterial in light of overwhelming evidence against defendant and would not have changed the result on trial.  Defendant was initially represented by the public defender's office in this case, but retained private counsel beginning January 8, 2002, and further retained different private counsel for his posttrial motions.  The record indicates that the State turned over discovery to the public defender, including police reports on October 18, 1999, March 15, 2000, June 6, 2000, and June 11, 2001.  From our reading of the record, because of the changes in defense counsel during the course of this cause, the "missing" reports very easily could have been left or lost within the prior defense counsel's office or files, and does not necessarily establish that the State failed to tender the documents.  We also note that there was no description of defendant contained in the record, leaving us unable to determine if the description of Saul was, in fact, "unique" as claimed by the defendant.  Additionally, as stated above, there is also no evidence that the police were initially looking for Saul as a suspect in this case.  Moreover, three eyewitnesses testified for the State, including Saul, that Saul and

defendant entered the bar and were asked to leave by Brito, that they later returned to the bar and that defendant began shooting. Hartung and Brito both identified defendant as the shooter from a photograph in 1992 and in a lineup in 1999. Further, defendant's own statement indicated that he and Saul entered the bar together, that he had a gun, and that he began shooting when he was approached by a man because he was afraid that the man was going to kill him. Accordingly, we cannot conclude that the State withheld exculpatory evidence from the defense, and defendant is not entitled to a new trial or evidentiary hearing on this issue.

Regarding the photo array which included Saul Salgado, it was not used by the State at trial, nor was it obtained from, nor did it belong to, defendant. Moreover, the photo array was not exculpatory evidence for defendant as there is no indication in the record, contrary to defendant's assertions, that Saul was ever a suspect in this case, only that Brito knew him and that he was present during the shooting. Accordingly, there was no discovery violation with respect to the photo array.

Defendant next contends that the trial court improperly denied defendant's request for an evidentiary hearing on his newly discovered evidence claim that three new witnesses described the State's key witness, Saul Salgado, as the shooter, where one witness was not listed in any police reports and moved out of town after the shooting, and the other two witnesses were identified in the police report that the State failed to tender to the defense.

"In Illinois, newly discovered evidence warrants a new trial when: (1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue but not merely

cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial." People v. Williams, 295 Ill. App. 3d 456, 462 (1998), citing People v. Molstad, 101 Ill. 2d 128, 134 (1984). "Motions for new trial on grounds of newly discovered evidence are not looked upon favorably by the courts and should be subject to the closest scrutiny." Williams, 295 Ill. App. 3d at 462. "Moreover, the denial of a motion for a new trial based on newly discovered evidence will not be disturbed on appeal absent an abuse of discretion." Williams, 295 Ill. App. 3d at 462.

Here, defendant's posttrial claim of newly discovered evidence was based on the affidavit of Carmelo Mendoza, a purported eyewitness to the shooting, and potential new witnesses, Abraham Perez-Merlos and Ricardo Rivera. Defendant's motion did not indicate how Mendoza was located, but Perez-Merlos and Rivera were apparently identified in early police general progress reports and not in the summary reports tendered to the defense. All three witnesses described the shooter as having a bleached blond ponytail, which Saul purportedly had in 1992. Additionally Mendoza, who knew Saul from school, indicated that Saul was the shooter. Mendoza never contacted the police and lived out of state between 1993 and 2000. According to defendant, Perez-Merlos and Rivera gave their descriptions of the shooter to police, which were recorded in the police general progress reports that were not turned over to the defense until after trial. Defendant argued that none of the witnesses were ascertainable prior to trial, but the trial court denied his motion without an evidentiary hearing, holding that the evidence was not new, that the defense had the information about Saul, that defendant had not demonstrated due diligence, and that the allegedly new evidence would not have changed the jury's verdict.

1-04-0856

We find that the trial court did not abuse its discretion in concluding that the evidence was not new, that the defense had not demonstrated due diligence and that the evidence would not have changed the jury's verdict. As indicated above, defendant was initially represented by the public defender's office in this case, but retained private counsel beginning January 8, 2002. On February 6, 2003, the record indicates that private defense counsel stated that he had received documents from the public defender's office including a letter from a State witness who identified Saul as the shooter. That statement indicates that private defense counsel was aware that at least one witness may have initially identified Saul as the shooter from discovery he received from the public defender's office. The trial in this matter did not occur until sometime in the fall of 2003, thus allowing defense counsel plenty of time to investigate the contents of this letter. Moreover, as discussed previously, we find that this alleged new evidence would not have changed the result on trial given the overwhelming evidence against defendant. Accordingly, the trial court did not abuse its discretion in denying defendant's request for an evidentiary hearing.

Defendant also contends that his constitutional right to effective assistance of counsel was violated where defense counsel failed to file a motion to suppress alleging: (1) that defendant's purported statement was not voluntarily signed; (2) that defendant's waiver of *Miranda* rights was not knowing and intelligent where the interrogating officer issued legally deficient rights; and (3) that the statement was inadmissible due to its lack of reliability, given the translator's blatant incompetence.

In Illinois, ineffective assistance of counsel is established when a defendant shows (1)

that his attorney's performance fell below an objective standard of reasonableness, and (2) that, but for counsel's shortcomings, a reasonable probability exists that the result of the proceedings would have been different. People v. Martinez, 348 Ill. App. 3d 521, 536 (2004). When questioning counsel effectiveness on whether to file a motion to suppress, defendant must show that such a motion would have been granted and that the outcome of the proceeding would have been different had the evidence been suppressed. People v Rucker, 346 Ill. App. 3d 873, 885 (2003).

We note at the outset that while defendant's posttrial motion contained allegations of ineffective assistance of counsel, these specific matters were not raised in that motion, which was filed by counsel different from his trial counsel and could have been raised; therefore, they are waived for consideration on appeal. People v. Enoch, 122 Ill. 2d 176, 185-86 (1988). Issues raised for the first time on appeal will only be reviewed under the plain error doctrine, which does not apply because this error did not deprive defendant of a fair and impartial trial, nor was the evidence closely balanced. People v. Laugharn, 297 Ill. App. 3d 807, 810-11 (1998).

In any event, we find that these issues have no merit as defendant was not prejudiced by defense counsel's representations. The record establishes that defense counsel did file a motion to suppress defendant's statement based on involuntariness, and the trial court specifically found that the defendant was properly advised of his *Miranda* rights and that he knowingly and intelligently waived those rights. Regarding whether the statement was inadmissible "due to its lack of reliability, given the translator's blatant incompetence," the record indicates that defendant was given proper *Miranda* warnings by Officer Thezan in Spanish before his first

custodial questioning, which defendant does not dispute; and he was subsequently given *Miranda* warnings by Officer Centano prior to each subsequent questioning.  Despite his contention that the subsequent *Miranda* warnings by Officer Centano were incorrect, *once an accused is advised of the Miranda warnings and acknowledges his understanding of them, the voluntariness of subsequent statements is not compromised by failure to repeat the warnings at each successive interview. People v. Daniel, 238 Ill. App. 3d 19, 32 1992 .*

Defendant was granted leave to cite additional authority on this issue, and he cites People v. Carmona-Olvara, 363 Ill. App. 3d 162, 842 N.E. 2d 313 (2005), to assist this court in resolving the issue concerning the accuracy and reliability of a statement attributed to defendant by an interrogating police officer who also served as interpreter.  We find Carmona-Olvara to be distinguishable from the case at bar in the following manner:  Carmona-Olvara involved a situation where the defendant sought to have an interpreter contest the officer's translation of defendant's statement to him when defendant testified that a particular word had a different meaning than that attributed by the officer.  The court held that the trial court erred by excluding evidence of a competing translation of defendant's answer to the officer's question.  That is not the case here and defendant has made no assertion that Officer Centano misstated defendant's words in his statement.

As defendant has not established that the motion would have been successful had it contained these additional arguments, we find that he received effective assistance of counsel at trial.

Finally, defendant, a Mexican national, contends that the trial court erred when it failed

1-04-0856

to suppress his written statement where his signature was procured in violation of the Vienna Convention. He contends that this error warrants reversal of his conviction and remand of this cause for a new trial with instructions that the statement be suppressed. We disagree.

Both the United States and Mexico are parties to and have ratified the Vienna Convention. Vienna Convention on Consular Relations, *opened for signature* April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (December 24, 1969, entered into force with respect to the United States). As such, the provisions of the Vienna Convention are considered the supreme law of the land, equal to federal statutes, and binding upon the states. U.S. Const., art. VI. The question in this case is whether the Vienna Convention confers a right and remedy individually to defendant.

This precise issue was addressed by this court in the recent case of People v. Sanchez, 362 Ill. App. 3d 1093, 841 N.E.2d 478 (2005), *pet. for leave to appeal pending,* No. 101869. In that case, the defendant claimed that her confession violated the Vienna Convention. Both the trial and appellate courts agreed; however, they also found that suppression of statements was not a proper remedy in that case. Sanchez, 362 Ill. App. 3d at 1104, 841 N.E.2d at 487.

Article 36(1)(b) states in full:

"If he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State, if within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to

the consular post by the person arrested, in person, custody or

detention shall also be forwarded by the said authorities without

delay. The said authorities shall inform the person concerned

without delay of his rights under this sub-paragraph." Vienna

Convention, art. 36(1)(b), 21 U.S.T. at 101, 596 U.N.T.S. at ___.

The plain language of this section appears to confer an individual right upon foreign

nationals in party States. Sanchez, 362 Ill. App. 3d at 1105, 841 N.E.2d at 488. Neither the

Illinois nor United States Supreme Court has definitively decided that the Vienna Convention

confers an individual right. Sanchez, 362 Ill. App. 3d at 1105, 841 N.E.2d at 488. However,

most recently, the Seventh Circuit Court of Appeals provided a summary of case law on this

issue and found that the Vienna Convention was self-executing and provides an individual right

of action. Sanchez, 362 Ill. App. 3d at 1105, 841 N.E.2d at 488, citing Jogi v. Boges, 425 F.3d

367 (7th Cir. 2005). Thus, defendant does have individual rights under the Vienna Convention,

which were violated in the instant case. Our next inquiry then, is whether the suppression of

evidence is the proper remedy for violation of the Vienna Convention.

To date, no court in Illinois has held that suppression of evidence is a remedy for a

violation of the Vienna Convention. Sanchez, 362 Ill. App. 3d at 1105, 841 N.E.2d at 487;

People v. Vasquez, 356 Ill. App. 3d 420, 426 (2005); People v. Griffith, 334 Ill. App. 3d 98, 111

(2002); People v. Hernandez, 319 Ill. App. 3d 520, 531 (2001); People v. Villagomez, 313 Ill.

App. 3d 799, 809-12 (2000). Moreover, the Seventh Circuit noted that though an individual

right was created, the overwhelming authority states that the remedy for a violation is not the

suppression of evidence. <u>Jogi</u>, 425 F.3d at 379-80.

As the Seventh Circuit Court in <u>Jogi</u> and this court in <u>Sanchez</u> have held before us, we decline defendant's request to ignore the overwhelming precedent throughout the country that suppression is not an available remedy for violation of the Vienna Convention. Defendant may have other avenues to pursue a remedy for violation of his rights; we, however must reject the instant claim. Accordingly, we find that the trial court did not err in failing to suppress defendant's written statement for violation of the Vienna Convention.

For the forgoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GARCIA, P.J., and HALL, J., concur.